IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

VANESSA M.,[1]
    Plaintiff,

          v.                                 Civil No. 3:19cv012 (DJN)

ANDREW M. SAUL,[2]
Commissioner of Social Security,
    Defendant.

## **MEMORANDUM OPINION**

On July 22, 2015, Vanessa M. ("Plaintiff") applied for Social Security Disability Benefits

("DIB") under the Social Security Act ("Act"), alleging disability from traumatic brain injury

("TBI") and major depressive disorder, with an amended alleged onset date of April 3, 2014.

The Social Security Administration ("SSA") denied Plaintiff's claim both initially and upon

reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claim in a

written decision and the Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision as the final decision of the Commissioner.

---

[1]     The Committee on Court Administration and Case Management of the Judicial
Conference of the United States has recommended that, due to significant privacy concerns in
social security cases, federal courts should refer to claimants only by their first names and last
initials.

[2]     On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term
as the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d),
Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill
as the defendant in this matter.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in: (1) finding that Plaintiff's TBI did not meet or medically equal the criteria of Listing 12.02; and, (2) affording "little weight" to the opinions of Gregory J. O'Shanick, M.D., and Arezoo Khanzadeh, Psy.D. (Mem. in Support of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 13) at 2-3.) This matter now comes before the Court on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[3] For the reasons that follow, the Court hereby ORDERS that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On July 21, 2015, Plaintiff filed an application for DIB with an amended alleged onset date of April 3, 2014. (R. at 13.) The SSA denied this claim initially on March 18, 2016, and again upon reconsideration on July 28, 2016. (R. at 13.) At Plaintiff's written request, the ALJ held a hearing on December 5, 2017. (R. at 13.) On May 31, 2018, the ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 13-26.) On November 13, 2018, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-3.)

---

[3]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

## II.     STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).  To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the

ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4), *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

### III.    THE ALJ'S DECISION

On December 5, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 13.) On May 13, 2018, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 13-26.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 16-26.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between April 3, 2014, her amended alleged onset date, and December 31, 2016, her date last insured. (R. at 16.) At step two, the ALJ found that Plaintiff had several severe impairments, including major neurocognitive disorder due to TBI,

4

somatoform disorder, depression and anxiety. (R. at 16.) At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (R. at 16.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work with additional limitations. (R. at 18.) Specifically, the ALJ found that "while [Plaintiff] could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs," Plaintiff could never "climb ladders, ropes, and scaffolds." (R. at 18.) The ALJ found that Plaintiff could "occasionally reach overhead bilaterally," but Plaintiff could not handle exposure to heights and hazards. (R. at 18.) Additionally, the ALJ concluded that Plaintiff could engage in "routine interactions with co-workers and supervisors in settings where tasks involve work primarily with things not people." (R. at 18.) Plaintiff "could have incidental interaction with the public and she was able to adapt to the occasional routine changes associated with unskilled repetitive tasks." (R. at 18.) However, the ALJ concluded that "[w]ith normal breaks," Plaintiff was limited "to understanding, remembering, applying, and carrying out unskilled repetitive tasks." (R. at 18.)

At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (R. at 24.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, including the representative occupations of sorter, inspector and document preparer. (R. at 25.) Therefore, the ALJ concluded that Plaintiff did not qualify as disabled under the Act.

## IV.    ANALYSIS

Plaintiff, forty-two years old at the time of this Memorandum Opinion, previously worked as a home attendant and a cashier. (R. at 24.) She applied for DIB, alleging disability

from TBI and major depressive disorder, with an amended alleged onset date of April 3, 2014. (R. at 259-60.) Plaintiff's appeal to this Court alleges that the ALJ erred in: (1) finding that Plaintiff's TBI did not meet or medically equal the criteria of Listing 12.02; and, (2) affording "little weight" to the opinions of Dr. O'Shanick and Dr. Khanzadeh. (Pl.'s Mem. at 2-3.) For the reasons set forth below, the ALJ did not err in her decision.

### A. The ALJ Properly Concluded That Plaintiff's TBI Did Not Meet or Medically Equal the Criteria of Listing 12.02, and Substantial Evidence Supports the ALJ's Findings.

Plaintiff first argues that the ALJ erred in her step-three determination that Plaintiff's TBI did not meet or medically equal the criteria of Listing 12.02. (Pl.'s Mem. at 6, 19.) Specifically, Plaintiff contends that the ALJ erred by finding that Plaintiff's TBI did not result in marked limitations in at least two of the functional areas outlined in Paragraph (B) of Listing 12.02. (Pl.'s Mem. at 6.) Plaintiff also argues that the ALJ failed to provide an adequate explanation for her findings. (Pl.'s Mem. at 12, 15-18.) Plaintiff adds that the ALJ erred by finding that Plaintiff's TBI did not satisfy Paragraph (C) of Listing 12.02. (Pl.'s Mem. at 19.) Defendant responds that Plaintiff failed to establish that she experienced marked limitations pursuant to Paragraph (B) and that substantial evidence supports the ALJ's finding that Plaintiff experienced only moderate impairments in the relevant areas of functioning. (Def.'s Mem. at 15.) Additionally, Defendant argues that Plaintiff failed to present evidence to satisfy Paragraph (C). (Def.'s Mem. at 22.)

At step three, Plaintiff bears the burden of proving that she meets or medically equals a listing. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990.) "For a claimant

6

to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* at 530.

To meet Listing 12.02's requirements and to qualify her as disabled at step three, Plaintiff's TBI must satisfy Paragraphs (A) and (B) or Paragraphs (A) and (C), which require:

> A. Medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the cognitive areas: 1. Complex attention; 2. Executive function; 3. Learning and memory; 4. Language; 5. Perceptual-motor; or 6. Social cognition. AND

> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:[4] 1. Understand, remember, or apply information; [or] 2. Interact with others [or] 3. Concentrate, persist, or maintain pace; [or] 4. Adapt or manage oneself.[5] OR

> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder; and 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.[6]

---

[4]     A "marked limitation" occurs when "functioning in [an] area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.F.2.

[5]     The regulations define understanding, remembering and applying information as "the ability[y] to learn, recall, and use information to perform work activities;" interacting with others as "the ability[y] to relate to and work with supervisors, co-workers, and the public;" concentrating, persisting and maintaining pace as "the ability[y] to focus attention on work activities and stay on task at a sustained rate;" and adapting or managing oneself as "the ability[y] to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.E.(1)-(4).

[6]     The regulations define a mental disorder as "'serious and persistent' when there is a medically documented history of the existence of the mental disorder in the listing category over a period of at least 2 years." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.G(2)(a). Under the first prong of Paragraph (C), ongoing medical treatment requires "a frequency consistent with accepted medical practice for the type of treatment or evaluation required for [the] medical condition." 12.00.G(2)(b). Under the second prong of Paragraph (C), "'marginal adjustment'

20 C.F.R. Part 404, Subpart P, App. 1, 12.02(A)-(C).

Here, the ALJ found that the severity of Plaintiff's impairments "considered singly and in combination, did not meet or medically equal" the Listing 12.02 criteria under both Paragraphs (B) and (C). (R. at 16.) The ALJ first examined the Paragraph (B) criteria. (R. at 16-18.) The ALJ considered Plaintiff's testimony, the objective medical history, and the opinions of state agency psychologists in reaching her conclusion that Plaintiff failed to satisfy the Paragraph (B) criteria. (R. at 16-17.) The ALJ also considered whether Plaintiff had satisfied the Paragraph (C) criteria, and again concluded that the evidence did not support a finding that Plaintiff's impairments met or medically equaled the listing criteria. (R. at 17-18.) The Court finds that the ALJ's explanation in support of her step three findings proved legally sufficient. Moreover, substantial evidence supports the ALJ's findings.

### i.  The ALJ Adequately Explained Plaintiff's Limitations in the Areas of Functioning Outlined in Paragraph (B) of Listing 12.02, and Substantial Evidence Supports the ALJ's Findings.

Pursuant to the first area of functioning under Paragraph (B), the ALJ found that Plaintiff had a moderate limitation in understanding, remembering or applying information. (R. at 16.) She supported her finding using Plaintiff's testimony and Plaintiff's treatment notes from March 2015, and acknowledged that Plaintiff's memory problems persisted through October 2015. (R. at 16.) The ALJ noted that Plaintiff still had "minor difficulties with her short-term memory" in February 2016, but observed that Plaintiff's "thought processes were intact and goal oriented."

---

means that . . . adaptation to the requirements of daily life is fragile" and the individual possesses "minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." 12.00G(2)(c). An individual has "achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of [her] symptoms and signs . . . for example, [she] ha[s] become unable to function outside of [the] home or a more restrictive setting without substantial psychosocial supports." 12.00.G(2)(c).

(R. at 16.) Ultimately, the ALJ concluded that Plaintiff's ability to take care of her child independently, travel alone and with her child, and volunteer at her child's school all indicated that Plaintiff had only a moderate limitation in understanding, remembering or applying information. (R. at 17.)

Substantial evidence in the record supports the ALJ's finding. Plaintiff testified that she has "a lot of memory issues." (R. at 50.) On March 2, 2015, Plaintiff presented to Dr. Khanzadeh complaining of memory problems and an inability to perform daily tasks. (R. at 282.) On May 21, 2015, Plaintiff complained that she had difficulty remembering words "due to short-term memory deficits" and struggled with recognizing words while reading. (R. at 337.) She suffered from "persistent and permanent deficits in her short-term memory" and indicated that she forgot things daily, including when to pick her daughter up from school, whether she completed basic hygiene and when to pay bills. (R. at 337.) By October 7, 2015, Plaintiff still had difficulty remembering and felt like she was "in a fog." (R. at 380.) However, by February 23, 2016, Faye Romano, M.D., concluded that while Plaintiff had minor disturbances in executive function and minor difficulty with short-term memory, she did not have difficulty with recent or long-term memory and exhibited focused thought processes. (R. at 387-88.) Furthermore, Plaintiff responded appropriately and consistently to questions about simple social and hazardous situations, suggesting to Dr. Romano that Plaintiff had "the ability for adequate judgment and insight." (R. at 387.)

On May 13, 2016, Laurencia duSantos, M.D., performed psychological testing on Plaintiff. (R. at 412-28.) Plaintiff told Dr. duSantos several times that she had difficulty remembering, especially recalling past events, but Plaintiff did not exhibit any significant cognitive limitations. (R. at 414.) Although Plaintiff argues that the ALJ "played doctor" by

generalizing Plaintiff's test results as being in the low-average range, (Pl.'s Mem. at 11), Plaintiff scored in the low-average range for auditory memory and visual working memory, in the extremely low range for visual memory, in the borderline range for immediate memory, and in the low-average range for delayed memory. (R. at 425.) Thus, the ALJ merely summarized complex testing results — she did not "play[] doctor" with respect to Plaintiff's memory testing. Overall, Dr. duSantos concluded that Plaintiff's cognitive and memory skills primarily ranged from low-average to high-average and that Plaintiff possessed "clinically significant but inconsistent memory deficits." (R. at 427.) Plaintiff's "working memory skills [were] least-developed and . . . indicative of short-term memory difficulties," and she had "severe deficits with respect to short-term memory and attention." (R. at 425.) But, Plaintiff had "[a]verage capabilities in understanding the principles that underlie nonverbal behavior and knowledge of general information about society." (R. at 425.) Moreover, Plaintiff's delayed memory skills scored higher than her immediate memory skills, which Dr. duSantos found unusual. (R. at 425.) Importantly, test results indicated that "Plaintiff endorsed her symptoms as worse than they actually were." (R. at 427.)

From September 2, 2016 through November 8, 2017, Plaintiff worked with a National Counseling Group ("NCG") community counselor, whom Plaintiff referred to as her "memory coach," to build mental health skills, organizational capacity, and improve her memory. (R. at 441, 447-48.) Plaintiff argues that the ALJ failed to consider the support Plaintiff received from her NCG mental health coach and family members in deciding that Plaintiff's daily activities support a moderate memory impairment. (Pl.'s Mem. at 11-12.) However, later in her analysis, the ALJ examined the contradictions between Plaintiff's need for help overcoming memory deficits with her ability to care for herself and her daughter, and volunteer at her daughter's

school. (R. at 21.) The ALJ acknowledged Plaintiff's help from her mental coach, but also pointed out that Plaintiff can "navigate various modes of travel while caring for her daughter." (R. at 21.) Overall, substantial evidence supports the ALJ's finding of a moderate impairment in understanding, remembering, and applying information, despite some evidence that Plaintiff struggles with short-term memory deficits.

The ALJ next concluded that Plaintiff experienced moderate limitations in interacting with others. (R. at 17.) In support of her conclusion, the ALJ considered Plaintiff's testimony that she experienced "social isolation and trouble communicating with others," but also frequently grocery shopped, volunteered at her daughter's school, traveled and performed other activities in public. (R. at 17.) Additionally, the ALJ noted that Plaintiff volunteered as a room mom for her child's class. (R. at 17.) The record substantially supports the ALJ's conclusion.

The record reflects that Plaintiff interacted with several individuals on a regular basis, including but not limited to: her psychiatrist, her mental health coach, her mother, her child's teacher, another woman with whom Plaintiff coaches cheerleading, a friend with whom Plaintiff attends ribbon yoga, her fiancé and her fiancé's mother. (R. at 39, 41, 62, 527.) Plaintiff also testified that she drove to visit her relatives in Florida with her daughter, stayed in a hotel and used rest stops along the way. (R. at 44-45.) Plaintiff grocery shopped in public at multiple stores and attended church weekly. (R. at 46, 451.) In May 2017, Plaintiff reported that she interacted with her youngest sister; attended a ribbon exercise class each Sunday with a friend; contacted her outpatient therapist, Dr. Khanzadeh, on a bi-weekly basis; talked to her fiancé at least one time weekly over the phone; and, contacted her fiancé's mother weekly over the phone. (R. at 516.) Around this time, Plaintiff invited ten children over to her home for her daughter's sleepover birthday party, which she hosted with the help of her sister and two friends. (R. at

511.) Although Plaintiff contends that these activities do not demonstrate her ability to interact with others, (Pl.'s Mem. at 13), the Court disagrees. Reasonable minds could determine that these reported activities demonstrate only moderate limitations in interacting with others, supporting the ALJ's conclusion.

The ALJ likewise found that Plaintiff had moderate limitations in concentrating, persisting or maintaining pace — the third area of functioning under Paragraph (B). (R. at 17.) The ALJ acknowledged Plaintiff's testimony that she takes intermittent breaks while performing tasks because her mind becomes exhausted, and noted that it takes Plaintiff longer to complete tasks. (R. at 17.) Additionally, the ALJ noted that a March 2015 mental status exam determined that Plaintiff exhibited poor concentration and that in February 2016 "[d]isturbances were noted in [Plaintiff's] attention and concentration." (R. at 17.) However, the ALJ also considered that "[b]oth State agency mental health reviewers thought [Plaintiff] had moderate difficulties" in concentrating, persisting or maintaining pace. (R. at 17.) And, the ALJ relied on Plaintiff's testimony that she could take care of her daughter, prepare food, wash dishes, do the laundry, drive, grocery-shop, attend her daughter's extracurricular activities and volunteer at her daughter's school. (R. at 17, 21.)

Substantial evidence in the record supports the ALJs conclusion that Plaintiff had only a moderate limitation in concentrating, persisting or maintaining pace. As the ALJ noted, Dr. Khanzadeh found Plaintiff's concentration poor during her mental health assessment on March 2, 2015. (R. at 17, 283.) However, by October 7, 2015, Plaintiff's concentration scored "2" on a scale from 0-6, with six representing the most severe, and she appeared stable with medication. (R. at 380.) On February 23, 2016, Plaintiff exhibited "disturbances . . . in attention and concentration" and demonstrated difficulty completing "some complex tasks even under

supervision," but she could still perform simple and repetitive tasks. (R. at 387-88.) Moreover, Dr. Romano noted that Plaintiff's ability to regularly attend work, perform work duties consistently and complete a typical workday or workweek appeared only mildly impaired. (R. at 388.) During her hearing, Plaintiff testified that she volunteered more than the required 15 hours per year at her daughter's school. (R. at 61.) Although Plaintiff argues that the ALJ "makes no reference" to the help that Plaintiff received from her mental health coach, (Pl.'s Mem. at 17), as mentioned, the ALJ later considered the support that Plaintiff received. (R. at 21). Therefore, between Plaintiff's medical records and reported daily activities, the Court concludes that sufficient evidence supports the ALJ's finding regarding Plaintiff's ability to concentrate, persist and maintain pace.

Regarding the final area of functioning under Paragraph (B) — Plaintiff's ability to adapt and manage herself — the ALJ found that Plaintiff had moderate or mild limitations.[7] (R. at 17.) The ALJ considered that Plaintiff exhibited moderate judgment and impulse control in March 2015 and that Plaintiff reported increased stress and anxiety in April 2016. (R. at 17.) However, the ALJ concluded that Plaintiff "does not appear to have marked difficulties regulating her emotions or controlling her behavior" and relied on Plaintiff's ability to live with her daughter and travel independently. (R. at 17.) Plaintiff argues that the ALJ did not reference the help that Plaintiff received from her mental health coach, but the ALJ *did* note that a mental health coach visited Plaintiff three times a week to help Plaintiff organize. (R. at 17.)

---

[7]     Because the ALJ contradicted herself regarding the level of Plaintiff's limitation, alternatively specifying "moderate" and "mild," the ALJ has committed an error. However, the Court concludes that because neither level satisfies Listing 12.02(B), the ALJ's error proves harmless. *See Shineski v. Sanders*, 556 U.S. 396, 411 (2009) (determination of harm caused by error requires "an estimation of the likelihood that the result would have been different").

Substantial evidence from the record supports the ALJ's findings.[8] Plaintiff has incorporated several stress relieving, anxiety reducing and similar self-help techniques into her routine, which indicates an ability to regulate her emotions and control her behavior. (R. at 39, 53-54, 395, 414, 441, 520). For example, although Plaintiff testified that she got angry when fatigued, Plaintiff also testified that she could follow instructions from her psychiatrist and counselor to sit, relax and meditate to control her anger. (R. at 54.) NCG's counselors taught Plaintiff "breathing exercises, sensory focus, and communication tools" to cope with potential panic attacks that Plaintiff might face in public. (R. at 414, 520.) She used "wave sounds" and yoga for relaxation and swimming for stress relief. (R. at 395, 441.) As part of NCG's goal to help Plaintiff with organizing, NCG community-based counselors gave Plaintiff an "All-in-One computer," which allowed Plaintiff to sync her daily schedule, shopping list and 'to do' lists with her phone to assist her with independent functioning. (R. at 525.) To manage neck and hip pain, Plaintiff attended physical therapy, where she participated in resistance training twice a week, received massages and underwent acupuncture. (R. at 53, 441.)

As for Plaintiff's ability to manage herself, the ALJ pointed out that Plaintiff claimed that her mother helps her while she volunteers at her daughter's school; yet, Plaintiff also takes frequent breaks from her mother. (R. at 21.) And, concerning Plaintiff's ability to maintain her well-being at work, Dr. Romano opined that Plaintiff exhibited only mild limitations in her ability to complete work activities and a normal workweek. (R. at 388.) During a May 13, 2016 examination, Dr. duSantos believed that Plaintiff would experience "great difficulty being

---

[8]     Plaintiff inaccurately contends that the regulations require the ALJ to address *both* adapting and managing oneself. (Pl.'s Mem. at 17.) However, the regulations are plainly written in the disjunctive, requiring either adapting or managing oneself. 20 C.F.R. Part 404, Subpart P, App. 1, 12.02(B).

reintegrated into the workforce," but nevertheless found that Plaintiff could make slow gains in vocational functioning. (R. at 427.) Overall, a review of Plaintiff's medical history provides substantial support for the ALJ's conclusion that Plaintiff did not suffer from any impairments that met or medically equaled the Listing 12.02(B) criteria.

2. ***Plaintiff's Objective Medical Records and the Medical Opinions Do Not Support the ALJ's Listing 12.02(C) Finding that Plaintiff Did Not Require Ongoing Medical Treatment; However, the ALJ's Error Proves Harmless, Because Plaintiff Exhibited Greater than Marginal Adjustment.***

The ALJ concluded that Plaintiff's TBI did not qualify as "serious and persistent" pursuant to Paragraph (C) of Listing 12.02. (R. at 17.) Paragraph (C) of Listing 12.02 requires evidence of both prongs. The ALJ determined that Plaintiff did not satisfy the ongoing treatment requirement under the first prong of Paragraph (C), because Plaintiff "did not require mental health therapy or a highly structured setting to diminish her symptoms." (R. at 17.) A claimant satisfies the first prong of Paragraph (C) if the claimant relies "on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [the] mental disorder." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.G(2)(b). The regulations define psychosocial supports as including "assistance from a crisis response team, social workers, or community mental health workers who help [the person] meet . . . physical needs . . ." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.D(1)(f). Based on these standards, the Court finds that substantial evidence does not support the ALJ's conclusion that Plaintiff did not require ongoing mental health treatment to diminish her symptoms.

On March 2, 2015, Plaintiff presented to Dr. Khanzadeh at NCG with depression and anxiety due to her TBI. (R. at 286.) Dr. Khanzadeh recommended an hour of treatment per week and proposed several coping mechanisms for Plaintiff to manage her depression and

anxiety. (R. at 287, 402-03.) Meanwhile, in and around March 2015, Plaintiff suffered multiple hardships that severely damaged Plaintiff's mental health to the extent that Plaintiff contemplated suicide. (R. at 228.) NCG placed Plaintiff on "high alert for crises" and "during this time [Plaintiff] received increased supervised visits by [a] mental health crisis counselor." (R. at 228.)

On November 12, 2015, Dr. Khanzadeh again identified several coping mechanisms to treat a relapse in Plaintiff's anxiety and depression. (R. at 405-06.) Dr. Khanzadeh recommended that Plaintiff continue with outpatient counseling and her treatment by Dr. O'Shanick. (R. at 407.) During Dr. Romano's psychological examination of Plaintiff on February 23, 2016, Plaintiff "appeare[d] to be compromised as a function of her current psycho-emotional functioning," and Dr. Romano believed that Plaintiff's condition could improve with weekly counseling. (R. at 385, 388.) Then, on April 7, 2016, Plaintiff reported increased anxiety and stress following a miscarriage. (R. at 394.) On May 4, 2016, Plaintiff again presented to Dr. Khanzadeh with anxiety and depression. (R. at 409-11.) Plaintiff had "made moderate progress towards her treatment goals" and had identified specific triggers of her anxiety. (R. at 411.) On October 6, 2016, Dr. O'Shanick recommended that Plaintiff continue her "work with [the] mental health skills building team." (R. at 442.)

Plaintiff received organizational help and mental health skills assistance from an NCG community counselor (whom the ALJ and Plaintiff call variously her "mental health coach" or "memory coach") on March 2, 2015; March 15, 2015; November 12, 2015; May 4, 2016; May 1, 2017; June 2-3, 2017; July 3, 2017; July 24, 2017; September 1, 2017; September 26, 2017; November 6, 2017; and November 8, 2017. (R. at 397, 401, 405, 409, 444, 455, 465, 475, 485, 496, 507, 518.) By May 1, 2017, Plaintiff had a community-based safety plan designed to deal

with increased panic attacks, which Drs. Khanzadeh and O'Shanick believed stemmed from Plaintiff's anxiety. (R. at 520, 524.) On July 3, 2017, her counselor noted that Plaintiff had "developed a plan to utlize [sic] professional supports in both mental health crisis situations and emergency situations" such as her car breaking down on I-95, receiving the news of her fiancé's father's death, and her daughter's medical emergency at home. (R. at 499.) By November 8, 2017, counselors visited Plaintiff "three times per week in three-hour intervals to assist her in developing and maintaining systems which allow her and her daughter to live as safely and independently as possible." (R. at 444.)

Plaintiff's mental health symptoms may have stemmed primarily from her TBI or from other external stressors that Plaintiff experienced. (*See* R. at 446 ("[S]he continues to struggle in managing her agitation and anxiety surrounding family conflict and physical health issues."); *but see* R. at 445 ("As a result of the traumatic brain injury she sustained, [Plaintiff] developed depression which inhibits her ability to function . . . .").) Regardless, Plaintiff was not undergoing traditional mental health therapy, and the ALJ correctly noted that Plaintiff did not require a highly structured setting or mental health therapy to diminish her symptoms. (R. at 17.) But, importantly, Plaintiff received ongoing psychosocial support from NGC for over two years to address symptoms stemming at least in part from her TBI. (R. at 282-98, 397-428, 444-528.) In fact, the ALJ acknowledged that Plaintiff "receives a lot of help in home to accommodate memory deficits . . ." (R. at 21.) Because the ALJ did not consider whether Plaintiff received ongoing psychosocial support, but merely looked at whether Plaintiff received mental health therapy or a highly structured setting to diminish her symptoms, the ALJ committed an error in her Listing 12.02(C)(1) analysis.

When confronted with an error committed by the ALJ, the Court must determine whether to apply the harmless error doctrine. *See Mascio*, 780 F.3d at 639 (analyzing whether the ALJ's error in the credibility assessment constituted only harmless error); *Sharp v. Colvin*, 660 F. App'x 251, 252 (4th Cir. 2016) (deeming the ALJ's errors harmless). The burden of establishing a harmful error rests on "the party attacking the agency's determination." *Shineski v. Sanders*, 556 U.S. 396, 409 (2009). In determining the significance of an error, courts must consider, among other factors, "an estimation of the likelihood that the result would have been different." *Id.* at 411. Further, "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency 'can decide whether reconsideration is necessary.'" *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011).

The ALJ's error with respect to the first prong constituted a harmless error, because Plaintiff must provide evidence of both prongs to satisfy Paragraph (C), and the ALJ determined that Plaintiff had not satisfied the second prong. With respect to the second prong, the ALJ determined that Plaintiff did not satisfy this prong — marginal adjustment — reasoning that Plaintiff had greater than a minimal ability to adapt to changes in her environment, because Plaintiff could take care of her daughter and live independently. (R. at 17.) The regulations dictate that individuals have marginal adjustment capabilities when they have "minimal capacity to adapt to changes in [their] environment[s] or to demands that are not already part of [their] daily li[ves]." 20 C.F.R. Part 404, Subpart P, App. 1, 12.00.G(2)(c). Claimants can only marginally adjust if increased demands or changes lead to their symptoms exacerbating such that they cannot function outside the home without "substantial psychosocial supports." 12.00.G(2)(c).

Here, substantial evidence in the record supports the ALJ's Listing 12.02(C) finding that Plaintiff manifested greater than marginal adjustment. During the hearing, Plaintiff testified that she had traveled to Iowa by train for two days to visit her fiancé within the past year. (R. at 49.) En route to Iowa, Plaintiff stayed in a Chicago train station and used a phone application for directions. (R. at 49.) Plaintiff also visited her family in Florida at least twice in three years and traveled to Puerto Rico once. (R. at 56-58.) Plaintiff drove herself and her daughter to Florida, which she accomplished using rest stops and meditation. (R. at 44-45.) Plaintiff's mental health coach helped her with these trips, including by giving Plaintiff maps of airports, ensuring that she had money, giving Plaintiff's daughter a "gadget phone," and creating trip itineraries, while Plaintiff's fiancé purchased the plane tickets and made the flight arrangements. (R. at 58.) Although her daughter's school required that Plaintiff volunteer a total of fifteen hours per year, Plaintiff admitted that she volunteered more than the required hours. (R. at 58.) And while Plaintiff claimed to have experienced "extreme anxiety when unexpected events arise," she showed that she could adapt to her daughter's changing extracurricular schedule, which included swim lessons, gymnastics, and Destination Imagination ("a science, engineering . . . thing for the school"). (R. at 42-44, 447.) Plaintiff's testimony that she could take cross-country and international trips and volunteer more than the required number of hours at her daughter's school, albeit with some help, indicates that she possessed greater than marginal adjustment.

Because the ALJ improperly found that Plaintiff did not require psychosocial support to diminish her symptoms under Paragraph(C)(1), but correctly found that Plaintiff demonstrated more than marginal adjustment, the ALJ did not err in reaching her overall conclusion that Plaintiff's TBI did not satisfy the criteria of Paragraph (C).

**B.    The ALJ Adequately Explained the Weight Assigned to Drs. O'Shanick's and Khanzadeh's Medical Opinions, and Substantial Evidence Supports the Weight Assigned.**

Plaintiff argues that the ALJ erred in according little weight to Drs. O'Shanick's and Khanzadeh's medical opinions and that substantial evidence does not support the ALJ's finding. (Pl.'s Mem. at 21.)  Specifically, Plaintiff contends that no evidence supports the ALJ's finding that Dr. O'Shanick lacked familiarity with the regulations and standards of the Act. (Pl.'s Mem. at 22.)  Plaintiff further argues that Dr. O'Shanick provided "specific objective abnormalities" rather than merely symptoms and that the ALJ failed to assess the regulatory factors. (Pl.'s Mem. at 21-24.)  Regarding Dr. Khanzadeh's opinion, Plaintiff contends that the ALJ failed to assess the regulatory factors and that substantial evidence did not support her assignment of weight. (Pl.'s Mem. at 25.)  Plaintiff contends that the ALJ's rationale for affording little weight to Dr. Khanzadeh's medical opinion proved "purely summary and generalized in nature" and that the ALJ did not tie her findings to evidence in the record. (Pl.'s Mem. at 24-25.)  Defendant responds that neither the regulations nor Fourth Circuit precedent require ALJs to give treating physicians' opinions great or controlling weight. (Def.'s Mem. at 24.)  Defendant further argues that nothing in the regulations requires the ALJ to "explicitly analyze" every factor that the ALJ considers in affording weight to a medical opinion, and that the ALJ had the discretion to afford little weight to Drs. O'Shanick's and Khanzadeh's medical opinions, because their opinions conflicted with substantial evidence in the record. (Def.'s Mem. at 24-28.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. § 404.1527(c). If, however, the medical opinions conflict internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-3p.[9] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. SSR 06-03p; § 404.1527(f).[10] Under the applicable regulations and caselaw, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and does not conflict with other substantial evidence in the record. § 404.1527(c)(2); *Lewis v.*

---

[9]     Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. § 404.1527(f). 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her claim on July 22, 2015 before this regulation took effect. (R. at 259.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[10]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. § 404.1527(f). The given examples are a non-exhaustive list. SSR 06-03p.

*Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion conflicts with other evidence or when it is not otherwise well-supported. §§ 404.1527(c)(3)-(4), (d).

When considering a treating source's opinion, the ALJ must evaluate those findings just as any other medical opinion. § 404.1527(c). The ALJ "will always give good reasons . . . for the weight . . . give[n to a] treating source's medical opinion." § 404.1527(c)(2). Determining the specific weight of medical opinions is especially important, because the regulations further require a comparative analysis of competing medical opinions. *See, e.g.*, § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the medical opinion of a source who has examined [plaintiff] than to the medical opinion of a medical source who has not examined [plaintiff].").

Treating source opinions are not the only opinions that an ALJ must consider. State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. § 404.1513a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. § 404.1513a(b)(1).

Requiring an ALJ to assign specific weight to medical opinions is necessary, because a reviewing court "faces a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence." *Arnold v. Sec'y of Health Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). Unless the Commissioner "has sufficiently

explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Id.* (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)) (internal quotation marks omitted). The assignment of weight needs to be sufficiently specific "to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . source's medical opinion and the reasons for that weight." SSR 96-2p (discussing affording weight to treating physician). Accordingly, a reviewing court cannot determine if substantial evidence supports an ALJ's findings "unless the [ALJ] explicitly indicates the weight given to all the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Strawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold*, 567 F.2d at 259)).

Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must consider the factors set forth in § 404.1527(c)(1)-(6) when deciding the weight to give any medical opinion. The factors include: (1) whether the source of the opinion has examined the Plaintiff; (2) whether the source of the opinion has a relationship with the plaintiff, and the nature, extent, and length of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole; (5) whether the source of the opinion is a specialist; and, (6) any other factors that support or contradict the opinion (including "the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has"). 20 C.F.R. §§ 404.1527(c)(1)-(6).

### i. *The ALJ Adequately Explained the Weight Afforded to Dr. O'Shanick's Opinion, and Substantial Evidence Supports the Weight Assigned.*

On May 1, 2015, Dr. O'Shanick opined that Plaintiff's TBI had caused "persistent and permanent deficiencies with her short-term memory; organizational capacity; problem solving;

planning and initiation, sustained attention, concentration and multitasking; error recognition; and speed of information processing." (R. at 21, 331.) He concluded that Plaintiff's TBI caused her to suffer from "persistent depression." (R. at 331.) And, because Plaintiff's deficiencies had lasted over 48 months, Dr. O'Shanick considered them "permanent and unremitting injuries." (R. at 331.) Ultimately, he concluded that Plaintiff's medical problems impaired her independence in daily activities, rendering her incapable of substantial gainful employment and "totally and permanently disabled." (R. at 331.)

The ALJ afforded little weight to Dr. O'Shanick's opinion, explaining that although Dr. O'Shanick had treated Plaintiff since her TBI in 2010, his recent treatment of Plaintiff had been "sporadic and conservative." (R. at 22.) The ALJ added that Dr. O'Shanick's opinion merely described Plaintiff's symptoms rather than her specific functional limitations. (R. at 22.) The ALJ also found inconsistencies between Dr. O'Shanick's opinion and Plaintiff's ability to take care of her daughter, which the ALJ opined demonstrated Plaintiff's ability to live independently and showed a greater functional capacity than Dr. O'Shanick had suggested. (R. at 22.) Additionally, the ALJ noted that Dr. O'Shanick was "not familiar with the regulations and standards of the Social Security Act." (R. at 22.) The Court finds that the ALJ's explanation for the weight assigned to Dr. O'Shanick's opinion to be legally sufficient, because the ALJ pointed to specific inconsistencies between the opinion and the evidence of record and otherwise pointed to relevant regulatory factors, including Dr. O'Shanick's understanding of the disability program. Importantly, the Court's own review of the record finds substantial support for the ALJ's assignment of weight.

Plaintiff argues that no evidence supports the ALJ's decision to discount Dr. O'Shanick's opinion, because he did not possess familiarity with Social Security Regulations and the Act.

(Pl.'s Mem. at 22.) Indeed, some courts have cautioned against ALJs speculating about treating physicians' lack of familiarity with the Social Security Regulations and the Act. *See, e.g.*, *Charleswell v. Berryhill*, 2017 WL 666093, at *7 (E.D.N.C. February 1, 2017) (finding it tantamount to speculation that the ALJ opined on the treating physician's familiarity with the Social Security disability process); *report and recommendation adopted* 2017 WL 663537 (E.D.N.C. Feb. 17, 2017); *Bonner v. Colvin*, 2016 WL 4408831, at *12 (S.D.W. Va. July 27, 2016) (concluding that an ALJ's conjecture that a treating physician was unfamiliar with the Social Security disability program was not a persuasive reason to discount a treating physician's opinion); *Smith v. Colvin*, 2013 WL 5436828, at *6 (N.D. Ind. Sept. 27, 2013) (finding that lack of familiarity with the Social Security Act's definition of disability was not a valid reason to discount a treating physician's opinion). Instead, the ALJ must build "'an accurate and logical bridge from the evidence to [the] conclusion[s]'" *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

Although Plaintiff argues that the ALJ's reasoning was "conjecture," (Pl.'s Mem. at 22.), the ALJ provided a reason for her assessment of Dr. O'Shanick's understanding of the disability process. Here, unlike the cases mentioned, the ALJ noted that Dr. O'Shanick provided symptoms rather than specific functional limitations in rendering his medical opinion. The Regulations permit the ALJ to consider other factors such as a treating source's understanding of the disability programs. §404.1527(c)(6). Because the ALJ correctly identified that Dr. O'Shanick did not give specific functional limitations, she provided a proper reason why Dr. O'Shanick's lack of familiarity with the Act supported her decision to discount his medical opinion. And, the ALJ built a logical bridge between the evidence of daily activities and

conservative treatment, which suggested a greater functional capacity, to her conclusion that Dr. O'Shanick's opinion deserved little weight.

Substantial evidence from the other medical opinions comports with the ALJ's conclusion that Dr. O'Shanick's treatment of Plaintiff was "sporadic and conservative." (R. at 22; *see* R. 319 (prescribing 150 mg Wellbutrin and multivitamins in April 2012), 318 (prescribing Wellbutrin in July 2012), 317 (prescribing Wellbutrin in November 2012), 316 (refilling Wellbutrin prescription and prescribing 50mg of Trazodone in May 2013), 314 (prescribing Wellbutrin in August 2013), 311-12 (continuing Wellbutrin and recommending B-vitamins in November 2013), 308-09 (refilling Wellbutrin and continuing B-vitamins in February 2014), 307 (prescribing Wellbutrin, fish oil, and Sambra cream in June 2014), 304 (continuing Wellbutrin in November 2014), 300 (refilling Wellbutrin and recommending vitamins in April 2015), 388 (recommending weekly counseling and cognitive behavior therapy techniques but no medication in February 2016), 427 (examination, recommending therapy, mental health skills building, and neuropsychological interventions but no medication in May 2016), 442 (refilling Wellbutrin prescription and recommending mental health skills building team in October 2016), 440 (continuing Wellbutrin prescription and vitamins, and recommending a therapy dog in April 2017), 438 (refilling Wellbutrin prescription in October 2017), and 19 (reporting taking Wellbutrin for over three years).) Regarding Plaintiff's physical pains, during her testimony, Plaintiff complained about pain in her right abdomen, right leg, back, and neck, but said that she does not take medication to address the pain and preferred conservative treatment like physical therapy, neck massages and acupuncture. (R. at 19, 51-53.)

The other medical opinions prove largely inconsistent with Dr. O'Shanick's opinion and support the ALJ's finding that Plaintiff possessed "a greater functional capacity." (R. at 22.)

First, the ALJ accorded partial weight to Dr. Faye Romano's, a mental health specialist, opinion. (R. at 22.) On February 23, 2016, Dr. Romano concluded that Plaintiff would not have difficulty performing simple and repetitive tasks, although she acknowledged that Plaintiff exhibited "psycho-emotional functioning." (R. at 388.) Dr. Romano noted that Plaintiff had only minor difficulties with short-term memory and no difficulties with long-term or recent memory. (R. 388.) Regarding Plaintiff's work limitations, Dr. Romano concluded that Plaintiff's ability to maintain regular attendance at work, consistently perform work tasks, and complete a typical work week suffered only a mild impairment. (R. at 388.) Plaintiff experienced only a mildly compromised ability to interact with co-workers and the public, and Dr. Romano doubted the authenticity of Plaintiff's prognosis. (*See* R. at 388 ("Her prognosis appears somewhat guarded.").)

On March 25, 2016, Dr. Shawne Bryant conducted an independent medical evaluation of Plaintiff. (R. at 22, 390-94.) The ALJ accorded partial weight to Dr. Bryant's opinion because, although she only examined Plaintiff once, the exam occurred in person. (R. at 23.) Dr. Bryant found that Plaintiff could "feed, bathe and dress herself." (R. at 390.) She could "do light house cleaning and prepare[] meals." (R. at 390.) Plaintiff could sit six hours with breaks during an 8-hour day, lift up to ten pounds frequently, and "perform manipulative maneuvers frequently." (R. at 392-93.) Significantly, Dr. Bryant concluded that "Plaintiff's credibility was questionable as to the severity of her alleged complaint." (R. at 392.)

Regarding Plaintiff's ability to work, Dr. Michael Koch and Dr. Eugene Noland both reviewed the evidence of record and concluded that Plaintiff could perform work, contradicting Dr. O'Shanick's opinion. (*Compare* R. at 23, 111 (finding that Plaintiff's deficits would not prevent Plaintiff from performing all activities), 141 (concluding that Plaintiff's "condition is not

severe enough to keep [her] from working."), *with* R. at 331 (opining that Plaintiff's symptoms render her unable to participate in gainful employment).) During his July 21, 2016 review of the evidence of record, Dr. Noland acknowledged that Plaintiff's condition limited her ability to perform work activities, but ultimately determined that Plaintiff could adjust to other work. (R. at 141.)

Dr. David Deaver also reviewed the evidence of record on March 18, 2016, and concluded that Plaintiff had "deficits in concentration" but experienced only moderate limitations in her ability to concentrate, maintain attention, and understand and remember specific instructions. (R. at 114.) Although Plaintiff "would require some additional supervision with changes and new processes . . . this would not erode her ability to successfully complete work." (R. at 115.)

Finally, on July 21, 2016, Dr. Howard Leizer reviewed the evidence on record and concluded that Plaintiff suffered from severe cerebral trauma, somatoform disorders, and anxiety disorders, but he concluded that Plaintiff's difficulties with social functioning, in the activities of daily living, and with concentration, persistence or pace proved only moderate. (R. at 131.) Dr. Leizer found that Plaintiff's difficulty with concentration and memory would limit her to simple 1-2 step tasks; only occasional, limited contact with large numbers of co-workers; notice and extra training to adapt to workplace changes and assistance with independent planning except for very simple tasks. (R. at 136-37.) However, Dr. Leizer also concluded that Plaintiff could receive constructive criticism from work supervisors, exhibited only moderate limitations in her ability to respond appropriately to changes at work and accept instructions, and exhibited no significant limitations in her ability to take precautions against hazards and in her ability to use public transportation. (R. at 137.) Importantly, Drs. Noland, Deaver, and Leizer all provided

specific functional restrictions, unlike Dr. O'Shanick who merely recited symptoms of Plaintiff's TBI and depression. (*Compare* R. at 114-15 ("moderately limited" and "not significantly limited") 131 ("moderate" and "mild" limitations), 136-37 ("not significantly limited," "moderately limited" and "markedly limited"), *with* R. at 331 (describing "persistent depression"), 380-81 (reporting nerves, anxiety and difficulty concentrating and remembering), 394-95 (noting difficulties with memory and recall, and depression), 436-43 (reporting depression, TBI, decreased concentration and memory problems). And, multiple medical opinions cast doubt on Plaintiff's credibility; thereby, undermining Dr. O'Shanick's conclusion that Plaintiff was "totally and permanently disabled." (R. at 331.)

The ALJ also justified her decision by pointing out that Plaintiff's testimony about her daily activities indicated a greater functional capacity than Dr. O'Shanick's medical opinion implied. (R. at 22.) For example, on October 2, 2017, Dr. O'Shanick wrote that Plaintiff's mother provided oversight and support to Plaintiff, including environmental structuring, driving when necessary, medication oversight and appointment scheduling, and recommended that Plaintiff receive additional help with these tasks. (R. at 443.) However, the ALJ aptly noted that on December 5, 2017, Plaintiff testified that she could perform "most activities of daily living independently." (R. at 24, *see* also 38-47 (describing her daily routine).) Plaintiff testified that her mother "gets overwhelming" such that Plaintiff tells her mother to "go away." (R. at 54.) Similarly, while in treatment, Plaintiff said that she lived with her mother, "implying that she required full-time help," but Plaintiff later testified that she had lived alone with her daughter for approximately four years. (R. at 21, 36.) Plaintiff's willingness to occasionally reject her mother's help does not support a finding of total disability.

While Plaintiff received NCG mental health building services, she could regularly make her daughter's breakfast and lunch, drop her daughter off at school, volunteer at her daughter's school, coach cheerleading, take her daughter to gymnastics and swim lessons, grocery shop at multiple grocery stores, and do the laundry. (R. at 19, 39-47.) As previously stated, Plaintiff drove to Florida to visit her relatives "at least twice" in three years, flew to Puerto Rico to visit her father and traveled to Iowa to see her fiancé. (R. at 44-46, 56-58.) Accordingly, substantial evidence supports the weight assigned to Dr. O'Shanick's opinion.

### ii. The ALJ Adequately Explained the Weight Afforded to Dr. Khanzadeh's Opinion and Substantial Evidence Supports the Weight Assigned.

On March 2, 2015, Dr. Khanzadeh evaluated Plaintiff's mental health status. (R. at 282-85). During this evaluation, Plaintiff exhibited impaired memory, poor concentration, poor impulse control, and deficits in peer relations and in dealing with authority. (R. at 283-84.) Her mood appeared unstable and anxious, and Dr. Khanzadeh thought that she seemed fairly reliable. (R. at 283.) Dr. Khanzadeh believed that Plaintiff required treatment to "restore cognitive functional levels" and improve her "maladaptive coping strategies." (R. at 284.) On May 7, 2015, Dr. Khanzadeh diagnosed Plaintiff with mood disorder due to her TBI and noticed that Plaintiff presented the following symptoms: memory deficits, depressive symptoms, difficulty sleeping, significant impairment in daily functioning, and difficulty with completing tasks. (R. 289, 333.) Additionally, Dr. Khanzadeh noted that small challenges easily irritated Plaintiff and that she had difficulty finishing tasks. (R. at 289.) Ultimately, she concluded that Plaintiff's brain damage rendered her unable to hold permanent employment and that Plaintiff was permanently disabled. (R. at 289). On January 6, 2016, Dr. Khanzadeh again reported that Plaintiff suffered the same symptoms. (R. at 384.) Plaintiff presented to Dr. Khanzadeh either weekly or bi-weekly around this time. (R. at 384, 445.)

The ALJ considered Dr. Khanzadeh's May 2015 opinion that Plaintiff complained of memory problems, depression, difficulty sleeping, significant impairment in daily functioning, and difficulty with completing tasks. (R. at 22.) She also considered Dr. Khanzadeh's statements before the amended onset date. (R. at 22, 290-92.) Ultimately, the ALJ accorded Dr. Khanzadeh's opinion little weight because it proved inconsistent with "the longitudinal record, including the claimant's course of treatment, objective findings, and reported daily activities." (R. at 22.) And, the ALJ properly noted that the determination of disability is reserved for the Commissioner. (R. at 22.)

The Court finds the ALJ's explanation regarding the weight assigned to Dr. Khanzadeh's opinion to be legally sufficient, because the ALJ cited to relevant regulatory factors that undermined Dr. Khanzadeh's opinion, including inconsistencies between the opinion and the record evidence and the dates of treatment. Importantly, the ALJ's explanation followed a narrative explanation of Plaintiff's course of treatment, the objective medical findings and Plaintiff's reported daily activities, allowing the Court to perform a meaningful review. As this Court has previously held, "[t]he ALJ need not repeat herself regurgitating [the evidence of record] each time that she considers an opinion," so long as the ALJ points to specific parts of the record that prove consistent or inconsistent with the relevant opinion such that the Court can determine whether substantial evidence supports the weight assigned. *Ross v. Berryhill*, 2019 WL 289101, at *6 (E.D. Va. Jan. 3, 2019) (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)), *report and recommendation adopted*, 2019 WL 281191 (E.D. Va. Jan. 22, 2019). The ALJ has done just that.

Moreover, the Court's own review of the record finds substantial support for the ALJ's statement that Dr. Khanzadeh's opinion proved "not consistent with the longitudinal record." (R.

at 22.) Plaintiff's course of treatment, which consisted mainly of a Wellbutrin prescription, vitamins, and assistance from her mental health skills coach, was largely conservative and contradicts Dr. Khanzadeh's expressed limitations. (R. 19, 22, 300, 304, 307-09, 311-12, 314, 316-19, 388, 427, 438, 440-42, 444-528.) Plaintiff testified to experiencing physical pain in her right abdomen, right leg, back, and neck, but said that she did not take medication to address the pain and preferred conservative treatment including physical therapy, neck massages and acupuncture. (R. at 19, 51-53.)

The medical opinions on record from Drs. Romano, Bryant, Noland, Deaver, and Leizer also conflict with Dr. Khanzadeh's conclusion that Plaintiff could not establish or maintain permanent gainful employment. (R. at 22.) Dr. Romano concluded that Plaintiff's ability to maintain regular attendance at work, consistently perform work tasks, and complete a typical workweek proved merely mildly impaired. (R. at 388.) Plaintiff's ability to interact with co-workers and the public appeared mildly compromised. (R. at 388.) Dr. Bryant found that Plaintiff could sit for six hours with breaks during an eight-hour day, lift up to ten pounds frequently, and "perform manipulative maneuvers frequently." (R. at 392-93.) Contrary to Dr. Khanzadeh's opinion, Drs. Koch and Noland concluded that, despite Plaintiff's restrictions, she could still maintain employment. (R. at 23; *compare* 111 (finding that Plaintiff's deficits would not prevent Plaintiff from performing all activities), 141 (concluding that Plaintiff's "condition is not severe enough to keep [her] from working."), *with* R. at 289 (opining that Plaintiff's symptoms render her unable to establish or maintain any type of employment).) Dr. Deaver found that Plaintiff required additional supervision, but ultimately possessed the ability to successfully complete work. (R. at 115.) Finally, Dr. Leizer noted that Plaintiff's memory and concentration difficulties would limit her to 1-2 step tasks and would require extra notice and

training to adapt to workplace changes, but ultimately concluded that Plaintiff could maintain gainful employment. (R. at 136-37.) Therefore, substantial evidence from the other medical records directly contradicts Dr. Khanzadeh's finding that Plaintiff could not work, which supports the ALJ's finding.

Plaintiff's testimony regarding her daily activities also conflicted with Dr. Khanzadeh's opinion that Plaintiff "could not establish or maintain any type of employment" and "was therefore permanently disabled." (R. at 22.) Plaintiff testified that she could perform most activities of daily life independently. (*See* R. at 38-47 (detailing her daily routine).) Although Plaintiff said that she lived with her mother, suggesting that she needed full-time assistance, Plaintiff later testified that she had lived alone with her daughter for approximately 4 years. (R. at 21, 36.) While she received mental health services, Plaintiff could regularly make her daughter's breakfast and lunch, drop her daughter off at school, volunteer at her daughter's school, coach cheerleading, take her daughter to gymnastics and swim lessons, grocery shop at multiple grocery stores, and do the laundry. (R. at 19, 39-47.) As mentioned, Plaintiff drove to Florida to visit her relatives "at least twice" in three years, flew to Puerto Rico to visit her father, and traveled to Iowa to see her fiancé. (R. at 44-46, 56-58.) Taken together, substantial evidence from the record related to Plaintiff's course of treatment, objective findings, and daily activities supports the ALJ's assignment of little weight to Dr. Khanzadeh's opinion.

## V.    CONCLUSION

For the reasons set forth above, the Court hereby ORDERS that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED and that the final decision of the Commissioner be AFFIRMED. An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  December 11, 2019